UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

| | |
|---|---|
| ARTHUR L. CAHOON; GLENGARRIFF VENTURES, LLC; ANTONIO R. SANCHEZ, JR., individually and as Trustee of THE SANCHEZ SPOUSAL TRUST; ANGELINA VENTURES, LLC; THE GEORGE M. SANCHEZ OIL & GAS TRUST and ARS, JR., GMS NON-EXEMPT REMAINDER TRUST, KELSEY V. STEWART OIL & GAS TRUST, and RICHARD A. STEWARD OIL & GAS TRUST as beneficiaries of THE GEORGE M. SANCHEZ OIL & GAS TRUST; MEDINA VENTURES, LLC; THE SANCHEZ MARITIAL TRUST and ARS, JR., GMS NON-EXEMPT REMAINDER TRUST, KELSEY V. STEWART OIL & GAS TRUST, AND RICHARD A. STEWART OIL & GAS TRUST as beneficiaries of THE SANCHEZ MARITIAL TRUST; RED VENTURES, LLC; THE SANCHEZ SPOUSAL TRUST; and PECOS VENTURES, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>BAYERISCHE HYPO-UND VEREINSBANK AG; BAYERISCHE HYPO-UND VEREINSBANK AG NEW YORK BRANCH; UNICREDIT U.S. FINANCE INC. (f/k/a HVB U.S. FINANCE INC. and HVB STRUCTURED FINANCE INC.); and HVB RISK MANAGEMENT PRODUCTS, INC.,<br><br>    Defendants. | Case No. 11-CV-1891 (RMB)<br><br>**DECLARATION OF ARTHUR L. CAHOON**<br><br>[ECF CASE] |

-----------------------------------------------------------x

I, Arthur L. Cahoon, declare:

1

1. I am a Plaintiff in the above-entitled matter and make this declaration of my own knowledge.

2. In 1997 I was CEO of Hiway Technologies ("Hiway"), a Florida based provider of Web Hosting services. Hiway was started in 1995 by Scott H. Adams and William G. Nesbitt. Later on, Steven J. Umberger, James R. Zarley and David S. Buzby joined Hiway.

3. In 1997 Hiway merged with Best Internet Communications ("Best"). In 1999 Best merged with Verio. Adams, Nesbitt, Umberger, Zarley, Buzby and I received substantial shares of stock in Verio as a result of the Best/Verio merger.

4. In 1999 Marcel Maier, a senior manager of the accounting firm of KPMG, read about the merger between Best and Verio. Maier and Tracie Henderson, another partner at KPMG, met several times with me, Adams, Nesbitt, Umberger, Zarley and Buzby. At first, Maier and Henderson recommended two investment strategies to us: Foreign Leveraged Investment Strategy ("FLIP"); and Offshore Portfolio Investment Strategy ("OPIS"). Maier and Henderson represented that both FLIP and OPIS were great investments that would shelter our capital gains and might also make a profit. Based on KPMG's recommendations, in 1999, Buzby, Zarley and I decided to invest in FLIP and Adams, Nesbitt and Umberger invested in OPIS.

5. Later in 1999 Adams, Nesbitt and Umberger realized additional capital gains from the sale of Verio shares. Henderson recommended that they invest in an investment called Strategic Investment Fund ("SIF"), later known as BLIPS.

6. In 2000 I sold my shares in Verio. Following the sale, I, too, was contacted by Henderson of KPMG, who advised me that I was going to realize a large amount of capital gains in 2000 from the sale of my Verio stock. Henderson recommended that I invest in BLIPS also.

Henderson told me that BLIPS had been developed by a group of financial advisors called Presidio Advisors and that BLIPS would be a great tax shelter for me and might even make a profit. KPMG told me that BLIPS was a legitimate transaction and it would be better and safer to pay 7% of the capital gains to KPMG rather than pay 20% of the capital gains in taxes.

7. I trusted and relied on KPMG and agreed to invest in BLIPS based on KPMG's representation that BLIPS was a legitimate investment strategy and would provide me with the tax shelter that KPMG told me I needed.

8. I never really understood BLIPS. It was extremely complicated and confusing. However, KPMG and Presidio assured me that they would help me every step of the way and tell me exactly what to do. Based on these assurances and my trust in KPMG and Presidio, I did everything I was told to do pertaining to BLIPS.

9. I was directed by Presidio to set up a limited liability company named Glengarriff Ventures, LLC, of which I was to be the sole owner. Presidio assisted me in forming Glengariff.

10. KPMG and Presidio told me that in order to make BLIPS work as a tax shelter, I needed to take out a large loan with HVB. Again, I did as they directed.

11. HVB sent me a letter of representation in connection with the BLIPS loan. The letter of representation, which HVB had signed, required that I acknowledge and represent that HVB had no involvement in nor did it accept any responsibility for the establishment, promotion or marketing of BLIPS. Based on these and similar representations by HVB, I believed that the only role HVB played in relation to BLIPS was that of an impartial, arm's length lender. Accordingly, on or about June 20, 2000, I entered into a Credit Agreement with HVB for a $133,300,000 loan. Declaration of Mark W. Lerner ("Lerner Decl."), Ex 2.

12. According to the Credit Agreement, HVB agreed to provide a "funding amount" of $133,300,000, consisting of an "initial unamortized premium amount" of $50,000,000 and a "stated principal amount" of $83,300,000 for a total "commitment" by the bank of $133,300,000. Lerner Decl., Ex. 2, Sec. 1.01, pp. 2, 3, 4 and 7 and Sec. 2.01, p. 9.

13. I did not understand what the term "initial unamortized premium" in the amount of $133,300,000 meant or why the loan was structured in this way. I still do not understand what the term means. In any event, I trusted that KPMG and Presidio had negotiated all the terms of the loan with HVB, including what was referred to as the "initial unamortized premium" amount, in order to maximize my chances that I would achieve the desired tax advantage.

14. It was my understanding at the time, based on the representations in the Credit Agreement, that HVB had in fact funded the loan pursuant to the Credit Agreement and that the loan funds were transferred into an account at HVB, to be managed by Presidio. Lerner Decl., Ex. 2.

15. On the advice of KPMG, I withdrew from BLIPS before the end of 2000 in order to take a tax deduction for BLIPS and offset my capital gains that year from the sale of my Verio stock. I withdrew from BLIPS for the additional reason that it would have cost more money to stay in, increasing my risk substantially.

16. KPMG and Presidio arranged for the law firm of Brown & Wood ("B&W") (now known as Sidley Austin) to write a tax opinion letter for me, a copy of which is attached hereto as Exhibit 1. I do not presume to understand B&W's tax opinion letter, but I was informed that it opined that I was entitled to take a deduction for BLIPS on my 2000 tax return; so, I did. Adams, Nesbitt, Umberger, Zarley, and Buzby took deductions on their 1999 tax returns for their participation in BLIPS.

4

17. The B&W opinion letter refers to several representations made by HVB, including the following representation regarding the two-part structure of the loan (principal and premium):

> Bank recorded for U.S. GAAP accounting purposes and U.S. regulatory purposes a even [sic] year loan whose premium is recorded separately and is amortized over the life of the Loan.

Exhibit 1, p. 10.

18. I did not understand the importance of the loan premium until after December 2010, when I learned for the first time that HVB and Presidio had entered into an agreement without my knowledge or permission and before I ever entered into the BLIPS transaction, to do an interest rate swap. I also did not learn until after December 2010 that the effect of the interest rate swap was to eliminate the loan premium and, worst of all, by eliminating the premium loan, HVB eliminated my tax deduction. The B&W opinion letter omits the fact that the interest rate swap effectively destroyed my tax deduction. Ex. 1. I did not find out and, despite my exercise of reasonable diligence, I could not reasonably have found any of this out until after December 2010.

19. The IRS subsequently disallowed the deductions that Adams, Nesbitt, Umberger, Zarley, Buzby and I took on our income tax returns for BLIPS. I never understood why the IRS disallowed the deduction. After the IRS disallowed the deduction for BLIPS, we all had to pay substantially more taxes and penalties.

20. Given that Adams, Nesbitt, Umberger, Zarley, Buzby and I had received assurances from KPMG, Presidio and B&W that the BLIPS investment was legitimate and that the deduction for BLIPS would be allowed, we contacted our legal counsel, Edmundo Ramirez of Ellis, Koeneke & Ramirez, LLP, to advise us of our rights and how we should proceed.

21. Without intending to waive any attorney/client privilege, I will state that whenever Adams, Nesbitt, Umberger, Zarley, Buzby or I received any information that gave us any clue of the possibility that we might have any claim against anyone in connection with BLIPS, we shared that information with our legal counsel as part of our exercise of reasonable due diligence. We, in turn, relied on our legal counsel, in the exercise of their reasonable due diligence on our behalf, to investigate any information we gave them or that they gathered on their own regarding possible claims in connection with BLIPS. Mr. Ramirez, who represented us in connection with BLIPS, is an extremely competent and diligent lawyer and I am confident that he exercised reasonable due diligence on our behalf in pursuing any hint of claims in connection with BLIPS.

22. On June 29, 2004, following a reasonably diligent investigation by ourselves and our legal counsel, including all information we had provided to them and all information they had obtained in the course of their reasonably due diligent investigation on our behalf of all possible claims in connection with BLIPS, we filed a complaint against KPMG, Presidio and Sidley Austin Brown & Wood in the Circuit Court of Palm Beach County, Florida. ("KPMG Complaint"). Lerner Decl., Ex. 1.

23. We did not name HVB as a defendant in the KPMG Complaint because, despite our exercise of reasonable due diligence in investigating all reasonably available information regarding all possible claims, we had no clues to look for and did not discover any evidence that HVB had committed fraud by entering into an agreement with Presidio, ahead of the loan to me, to do an interest rate swap after the loan, which eliminated the premium loan, yet still charged me fees for a loan that did not exist. Lerner Decl., Ex. 1. We did not know and could not, in the exercise of reasonable due diligence, have discovered HVB's fraud until these facts were

revealed through the testimony of witnesses in the criminal case of U.S. v. Stein, and through the Deutsche Bank Non-Prosecution Agreement ("NPA") of December 10, 2010, none of which either I or my legal counsel were informed of until after December 2010. A copy of the excerpts of the testimony in the Stein case is attached hereto as Exhibit 2. A copy of the Deutsche Bank NPA is attached hereto as Exhibit 3.

24. During the pendency of the lawsuit against KPMG and B&W, neither I nor our legal counsel were aware of any information that did or, in the exercise of reasonable due diligence, should have given us notice of the possibility of a claim for fraud against HVB for charging fees for a loan that did not exist.

25. We eventually settled our claims against KPMG and B&W. At that time, we still did not know of any basis to sue HVB for fraud. We had no clues or evidence of HVB's fraud that would warrant further investigation. Therefore, my legal representation by Ellis, Koeneke & Ramirez pertaining to BLIPS essentially ended at that point, since we knew of no basis for a fraud claim against HVB.

26. I did not have any information that put me on notice of the possibility that HVB committed fraud by charging fees for a loan that did not exist until sometime after December 2010, when my legal counsel in the KPMG Complaint, Mr. Ramirez, was informed by Brian G. Isaacson of Isaacson & Wilson of the testimony of Amir Makov, one of the principals of Presidio, in the criminal case of U.S. v. Stein and of the Non-Prosecution Agreement entered into by Deutsche Bank on December 10, 2010. Exhibits 2 and 3. Sometime in January or February 2011, Mr. Ramirez, informed me of what Mr. Isaacson had told him about Makov's testimony and of the Deutsche Bank NPA.

27. It was not until I was contacted by Mr. Ramirez, following his communication with Mr. Isaacson, that I was informed of the evidence that came out in the Stein case and from the Deutsche Bank NPA that I learned for the first time that before making any BLIPS loans, HVB had entered into an agreement with Presidio whereby HVB would and did swap the fixed interest rate of the premium loan for a variable interest rate after I had entered into my loan. See attached excerpt of the testimony of Matthew Dunn, Deputy Treasurer of HVB, Ex. 2, 2952 and 2967.

28. Also, it was not until after December 2010 that I was informed of Makov's testimony and of the Deutsche Bank NPA that the HVB interest rate swap had the effect of eliminating the premium loan on which my tax deduction was based, thereby eliminating my tax deduction as well. Ex. 2, 3064-3071, and 3079-3082; and Ex. 3, NPA, Statement of Facts, ¶ 10.

29. I also learned after December 2010 for the first time from Makov's testimony that HVB did the interest rate swap for its own benefit, not mine, because HVB wanted to eliminate its interest rate risk exposure by swapping the fixed interest rate of the premium loan for a variable rate loan. Ex. 2, 3064-3071.

30. I also learned from my legal counsel sometime after December 2010, that on December 10, 2010, Deutsche Bank entered into a Non-Prosecution Agreement ("NPA") with the United States Department of Justice. Ex. 3. The Statement of Facts section of the NPA states that "the BLIPS transactions were designed by KPMG and Presidio to create the impression that the loans had an unusual premium structure at an interest rate well above prevailing market rates." Ex. 3, Statement of Facts, ¶ 10. In the same paragraph, the NPA states that "DB knew that the premium structure was necessary for the loans to generate the tax benefits sought by the customers."

31. I did not know until after December 2010 that HVB was aware that the premium structure of my BLIPS loan was necessary in order for me to realize the tax advantages of my investment in BLIPS, just as admitted to by Deutsche Bank in its NPA. I did not discover until then that HVB had entered into a secret agreement with Presidio to do an interest rate swap. I did not discover until after December 2010 that HVB knew that the interest rate swap it executed eliminated the premium loan and eliminated my ability to take a tax deduction. I did not know until then that HVB never gave me, nor did it ever intend to give me the two-part structured loan (principal and premium) that it had agreed to give me, yet HVB charged me fees for a structured loan that did not exist. Had I known these facts at the time, I would never have invested in BLIPS. Furthermore, had I known these facts prior to December 2010, I would have sued HVB for fraud sooner than I did.

32. We were not able to discover HVB's fraud, despite the exercise of reasonable due diligence by me and my legal counsel. We did not have a clue that HVB and Presidio had a prior agreement between themselves to enter into the swap agreement or of the adverse effect that had on the premium loan or of the dire tax consequences of the swap to me.

33. My lack of knowledge of HVB's fraud prior to January 2011 was not due to any lack of diligence on my part—it was due to HVB's active and fraudulent concealment of the fact that the loan premium that I had bargained for as part of the HVB loan was fraudulently eliminated by HVB when HVB agreed with Presidio behind my back to do the interest rate swap.

34. I respectfully request that the Court not dismiss my claim against HVB on statute of limitations grounds. HVB concealed its fraud from me all these years, despite my due diligence to investigate BLIPS. Under these circumstances HVB should not be permitted to use the statute of limitations as a defense to evade responsibility for the damage it has caused me.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct. Executed this 13th day of July, 2011, at _Jacksonville, Florida_

Dated: July 13, 2011

_____
Arthur L. Cahoon

## CERTIFICATE OF SERVICE

I certify that the Declaration of Arthur L. Cahoon was served on all attorneys of record by the CM/ECF system on July 14, 2011.

/s/ /Brian G. Isaacson
Brian G. Isaacson
ISAACSON & WILSON, P.S.
1200 Fifth Avenue, Ste. 1900
Seattle, WA 98101-3135
Tel:   206-448-1011
Fax:   206-448-1022
Email: bgisaacson@isaacsonwilson.com
*NYSD # IB 8224*